IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | CASE NO. 4:23-MJ-0833-2 |
| | § | HOUSTON, TEXAS |
| VERSUS | § | WEDNESDAY, |
| | § | MAY 3, 2023 |
| TYREE HERBERT | § | 10:03 A.M. TO 11:40 A.M. |

**PRELIMINARY EXAM AND DETENTION HEARING (VIA ZOOM)**

BEFORE THE HONORABLE ANDREW EDISON
UNITED STATES MAGISTRATE

| | |
|---|---|
| APPEARANCES: | SEE NEXT PAGE |
| ELECTRONIC RECORDING OFFICER: | DISA McKINNIE-RICHARDSON |
| COURTROOM CLERK: | RUBEN CASTRO |

TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 Eldridge Road, #144
Sugar Land, TX 77478
281-277-5325
mary@judicialtranscribers.com

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

APPEARANCES (VIA ZOOM):


FOR THE UNITED STATES:          U.S. ATTORNEY'S OFFICE
                                Sherri Lynn Zack, Esq.
                                1000 Louisiana
                                Ste. 2300
                                Houston, TX 77002
                                713-567-9374


FOR THE DEFENDANT,
TYREE HEBERT:                   FEDERAL PUBLIC DEFENDER
                                Tatiana Patricia Obando, Esq.
                                440 Louisiana
                                Ste. 1350
                                Houston, TX  77002
                                713-718-4600

FOR THE DEFENDANT,
KAMARA HALL:                    LEWIS THOMAS, ESQ.

INDEX

| WITNESS: | Direct | Cross | Redirect | Recross |
|----------|--------|-------|----------|---------|
| Joseph Gregory | . | 14 | 34 | -- |

| EXHIBITS: | | Offered | Received |
|-----------|--|---------|----------|
| Court's 1-2 | | 11 | 11 |

***

**HOUSTON, TEXAS; WEDNESDAY, MAY 3, 2023; 10:00 A.M.**

THE COURT:  We are here today on case 4 -- can you hear me in the courtroom?

MS. ZACK:  Yes, Your Honor.

MR. THOMAS:  Yes.

THE COURT:  We're here today on case 4:23-MJ-833-2 and 833-3, the United States versus Tyree Herbert and the United States versus Kamara Hall.

Who do we have for the Government?

MS. ZACK:  Sherri Zack on behalf of the United States, Your Honor.

THE COURT:  I can't hear Ms. Zack.

(Off record chatter - Technical issues.)

MS. ZACK:  Now can you hear me, Your Honor?

THE COURT:  Loud and clear.

MS. ZACK:  Thank you.  Sherri Zack on behalf of the United States.

THE COURT:  Is that the old we-got-to-turn-on-the-microphone trick?

MS. ZACK:  No.  It was plugged into the wrong something or other.  I don't know.

THE COURT:  Ah, okay.  For the Defendants, for Mr. Herbert?

MS. OBANDO:  Tatiana Obando, Your Honor.

THE COURT:  Hello, Ms. Obando.

And for Ms. Hall?

MR. THOMAS:  Lewis Thomas on behalf of Ms. Hall. Good morning.

THE COURT:  To you, as well.

Okay.  We're here for a preliminary hearing and a detention hearing.  Government ready to proceed?

MS. ZACK:  Yes, Your Honor.  However, I believe --

THE COURT:  Before --

MS. ZACK:  -- I believe that counsel for Ms. Hall and I are going to be able to agree to conditions.  Her mother is on her way here.  So we'd ask that we proceed on Mr. Herbert, and we will come up with a plan for Ms. Hall after the hearing for Mr. Herbert.  And I believe, and counsel can correct me if I'm wrong, Ms. Hall is waiving her PC hearing.

MR. THOMAS:  That's my understanding, Judge, with the agreement that she would be released to a third-party custodian.

THE COURT:  Okay.  Well, why don't we just put Ms. Hall to the side for a moment, because if her mom's coming in, I want to talk to her mom about the third-party custodian issue.  Then we'll move forward with the hearing.

So I guess you can put Ms. Hall back in the jury box, and we can proceed with Mr. Herbert's preliminary hearing and detention hearing.

Ms. Hall, we'll be back with you in a few moments.

So now we want to go proceed against Mr. Herbert. And let me ask -- to start off, I've read the motion, the Defendant's objection to detention hearing and request for release on condition.

It was filed yesterday, and I assume, Ms. Zack, you got a copy of that and taken a look at it?

MS. ZACK:  Yes, Your Honor.  Do you want me to respond to it?

THE COURT:  Please comment.

MS. ZACK:  Sure.

THE COURT:  Something tells me you probably -- you probably don't agree, but I'd like to hear your response.

MS. ZACK:  No, I do agree with one part of it. According to 18 USC 3142 subsection (f)(2):  Upon motion of the attorney for the Government or upon the judicial officer's own motion in a case that involved a serious risk that such person would flee, that they're alleging that there is no serious risk of flight.

I would agree that there is no serious risk of flight, whatever that means.  However, the second portion of that says:  A serious risk that such person will obstruct or attempt to obstruct justice or threaten, injure, or intimidate or attempt to threaten, injure or, intimidate a prospective witness a prospective witness or juror.

He has already done that.  So we're already in that posture, and I believe that in addition to the facts in the Criminal Complaint, I can add other facts as part of this proffer that demonstrate that he is not going to leave these people alone.  They are terrified of him, and I believe that if I can demonstrate that to this Court that he poses a serious risk of obstruction, threatening, or harming these individuals, intimidating them, and I'm speaking specifically of the victim and his wife, that Your Honor can absolutely detain him.

But their motion is devoid of any mention of that.

THE COURT:  I'm with you.  So, Ms. Obando, help me out.  I had a funny feeling that was going to be Ms. Zack's argument, 3142(f)(2) provides two separate issues.  (A) is, a serious risk the person will flee, which is what your motion addresses, but your motion does not address the second one which is (B), a serious risk that such person will obstruct or attempt to obstruct justice or threaten, injure, or intimidate or attempt to threaten, injury, or intimidate a prospective witness or juror.

And Ms. Zack's argument here today, and she said the same thing the other day at the initial appearance is, hey, based on the allegations, you know, set forth in the complaint at least it falls right under -- well, forget about whether the Defendant in fact did grant it.  And let's

assume for the sake of argument the Defendant is not a serious risk for flight.  Doesn't this fall right within 31(2)(f) -- 3142(2) -- (f)(2)(B)?

MS. ORBANDO:  Thank you, Your Honor.

Yes, I understand the argument.  However, what the Government raised in the complaint and at the previous hearing is that my client allegedly threatened to kill the victim's animals or his chickens.  They are not protected by the statute.

THE COURT:  I don't understand.  Why would that -- isn't that a -- assuming that allegation is true for the sake of argument, isn't that a serious risk of obstruction or attempting to obstruct justice or threaten, injure, or intimidate a prospective witness?

MS. OBANDO:  Well, Your Honor, I'm referring to the chickens here.  That's what the Government raised and that's what's been alleged in the complaint.

THE COURT:  Right.  So I'm with you --

MS. OBANDO:  So I fail to see -- first of all -- let me stand up.

First of all, that would give -- if it was a threat to the victim, then I would understand.  That wasn't the reason that the hearing was set.  What my notes indicate that, and I may be wrong about this, is the Government said that he has no assets, no ties to the community, and my

client threatened to kill the victim's animals.  That's what my notes said.  They don't say -- and I read the complaint very carefully, several times.  But he's --

THE COURT:  I'm with you.  I'm not -- I'm not disagreeing with you.  I guess my point is this, if the threat is -- hey, if someone came to you and said I'm going to kill your dog, isn't that pretty -- isn't that a threat or intimidate to obstruct justice or to intimidate --

MS. OBANDO:  Well, I believe that --

THE COURT:  -- to intimidate you?

MS. OBANDO:  -- I believe that it would go towards -- and getting to what stalking means, it will go into what the animal is considered to be.

THE COURT:  Fair enough.  Fair enough.  I guess my question is going to be this:  If I understand your position is, I should not even hold a detention hearing --

MS. OBANDO:  Yes, Your Honor --

THE COURT:  -- at this point in time?

MS. OBANDO:  -- that's my position.

THE COURT:  Okay.  I understand it, respectfully disagree.  I think this unquestionably falls within 41(2)(f), (2)(b).

And so let's proceed with the detention hearing.  As you-all know, I like to do the proffer.

MS. OBANDO:  Thank you.

THE COURT:  So let me ask Ms. Zack, who is the witness you intend to call here today?

MS. ZACK:  Your Honor, the United States intends to call Special Agent Joseph Gregory.

THE COURT:  And just so we're clear, my preference is if we do the probable cause and the detention issues all at one time.

And so, Agent Gregory, if you would please listen closely to the proffer that Ms. Zack is about to make. After she has completed, I'll turn to you, swear you in, and then ask if that proffer is 100 percent true, correct, and accurate.  If it is, let me know.  If it's not, I want to make any change -- want you to make any changes that need to be made to make it a 100 percent accurate so that it is your testimony under penalty of perjury here today, and then I'll turn it over to defense counsel for cross-examination.

With all that said and done, Ms. Zack, the floor is yours.

MS. ZACK:  Your Honor, I would ask, first and foremost, because Special Agent Gregory was the one that swore to the Criminal Complaint, that we incorporate the facts in the Criminal Complaint.  Unless Your Honor wants me to reread that into the Record because that would be the basis -- the first basis of the proffer.

I have some additional facts to add, but he can be

cross-examined on all those facts.

THE COURT:  I have read the Criminal Complaint.  I know that the Defendant has had an opportunity to read the Criminal Complaint, and I will enter into evidence, for the purposes of this hearing today, Exhibit 1, which will be the Criminal Complaint.  And I will also enter as Exhibit 2 the pretrial report for the Defendant.

So Exhibit 1 is the complaint, Exhibit 2 is the pretrial report.  And I'm happy -- if you want to add anything, you can, but I don't think we need to reread the entire Criminal Complaint into the Record.

(Court's Exhibit Nos. 1 and 2 were admitted.)

MS. ZACK:  Thank you, Your Honor.

I would add, Your Honor, that Special Agent Gregory would be able to tell you that he has reviewed text messages and spoken with witness Vanessa Walther, who is the attorney referenced in the Criminal Complaint.  And based on these conversations and the text messages, additional text messages that have been reviewed, that the Defendant, Mr. Herbert, indicated in those that he actually lives five minutes from that property.

That there was an instance where Mr. Herbert and Ms. Hall were actually on the property unaccompanied by the victim and his wife.  They were not home.  When the victim and his wife showed up, clearly the wife didn't know what

was going on.  But the Defendant, Mr. Herbert, at that point, had destroyed some property around the pool, either breaking planters and/or throwing them into the pool.

That he also was there on another occasion when nobody was home, and we know he was there because he placed a call to the victim's wife.  She was at a family gathering.  He started cursing and screaming at her.  The wife was so visibly upset by this that her daughter took the phone away from her, and he started cursing and screaming at the daughter and was telling her, I am at their home and they shouldn't leave their keys in the car.

They live on a big piece of gated property out in the country, Your Honor, and they are now standing on the property without permission to be there, telling the people that we're here, and you better pay up, and by the way, don't leave your keys in the car because, you know, you never know what could happen to them.  This clearly upset the wife.  The daughter got upset.

Obviously as the Court knows from the Criminal Complaint, they had to put in an alarm system because of this.  We know that when the Defendant was arrested, he placed a call at one point to his grandmother and there was a conversation about how the Defendant, Mr. Herbert, is in possession of either some type of gate opener or garage opener that belongs to the victim and his wife.

It is clear that this individual has been on this property numerous times; that he has been on the property numerous times without permission.

As Your Honor can see from the -- well, I won't get into the argument at that point. Just that he has been on the property and has access to the property through either a gate opener or a garage door opener, and there are text messages that show that the Defendant was clearly working with Ms. Hall and with Mr. Brooks.

All three of them met at the restaurant with Vanessa Walther, and at that point the Defendant admitted to her that he had been on the property when the victim and his wife were not there, specifically referencing destroying the planters or throwing them in the pool. That was confirmed by the victim.

Additionally, he also admitted that he made the threat to kill the chickens. And I will argue the significance of that, Your Honor, when we get to that.

Mr. Brooks also indicated in communications that the Defendant had taken car keys from the victim's property, and that on several occasions that he was aware, Mr. Herbert was aware, of the comings and goings of the Defendant -- the victim as he had been to the property numerous times without permission and without the victim being home.

There are also other -- as far as the conspiracy

goes, there is indications -- there are photographs of Ms. Hall in possession of the victim's credit cards, and because this is a conspiracy, that can be attributed to Mr. Herbert.

THE COURT:  I just want the proffer.  Our hearing's later on.  Let's focus on the proffer from Special Agent Gregory.

MS. ZACK:  Right.  That credit cards were stolen from the property and used unauthorized by the co-conspirators.

And I believe, Your Honor, that in addition to the Criminal Complaint, is what I have at this point.

THE COURT:  Okay.  Agent Gregory, if you would do me a favor and raise your right hand, sir.  Raise your right hand, sir.

(Witness sworn.)

EXAMINATION OF JOSEPH GREGORY

THE COURT:  You heard the proffer made by Ms. Zack.  Do you accept that proffer as true and correct under the penalty of perjury, or is there anything that needs to be changed, altered, or modified to make it 100 percent accurate?

THE WITNESS:  I do, Your Honor.

THE COURT:  You do, what?

THE WITNESS:  I swear, yes, I accept it.

THE COURT:  Okay.  So you accept the proffer as your own testimony here today under oath?

THE WITNESS:  I do, Your Honor, I accept the proffer as my own testimony.

THE COURT:  Thank you very much.

Ms. Obando, the floor is yours.

MS. OBANDO:  Thank you, Your Honor.

CROSS-EXAMINATION OF JOSEPH GREGORY

BY MS. OBANDO:

Q    Mr. Gregory --

A    Yes, ma'am.

Q    -- when did this investigation start?

A    In April of 2023 was the last month, ma'am.

Q    2021st.

A    No, in April of 2023, ma'am.  So this last month.

Q    And could you please tell me how did it start?

A    We received information from Complainant, Vanessa Walther, indicating that her client, Mr. Louis Smolders, was being extorted and threatened.

Q    And how is it that you know Ms. Walther?

A    I didn't know Ms. Walther until the complaint had been made, ma'am.

Q    Okay.  And she said her client, what is Ms. Walther?

A    Ms. Walther is an attorney.

Q    I can see here that she's a former FBI agent?

A    Yes, ma'am.

Q    And you are an FBI agent, as well?

A    I am, correct.

Q    Is that common?

A    Is what common, ma'am?

Q    That former FBI agents would contact FBI to place a complaint?

A    Well, I would imagine that former FBI agents are more in tune with what constitutes a violation of federal law and something that the FBI would be interested in.  So I wouldn't say it's uncommon, but I had no knowledge of Ms. Walther's existence prior to --

Q    Prior to this?

A    -- her contacting us.  Ys, ma'am.

Q    Thank you.

So this happened in April '23 -- April this year when you received the complaint?

A    Yes, ma'am.

Q    Okay.  Then it says that on April 20th you met with the alleged victim?

A    Correct.

Q    And what happened during that meeting?

A    Well, we met with Mr. Louis Smolders and he -- and we interviewed him.

Q    And what happened?

A    The results of the interview?

Q    Yes.

A    Mr. Smolders told us that he was being extorted and threatened by three individuals:  Mr. Antoine Brooks, Mr. Tyree Herbert, and Ms. Kamara Hall.

Q    He also told you that he had contacted -- contracted the services of a prostitute, right?

A    Correct.  Yes, ma'am.

Q    And he talked to you about having consensual sexual encounters with my client?

A    Yes, ma'am.

Q    Did he tell you for how long?

A    He wasn't able to indicate how long it had been going for.  So I didn't get a solid date range.

Q    Okay.  Did he tell you about the circumstances?

A    The circumstances that led to the sexual encounter?

Q    Yes.

A    Yes, ma'am.  He found an advertisement for Mr. Herbert's services online.

Q    In what year?

A    I believe it was 2022.

Q    Okay.  Do you know the age of Mr. Herbert, right?

A    Correct.  He is 18 since July of 2022, I believe, ma'am.

Q    Okay.  Did he tell you when this encounter start?

A    No, he wasn't able to put a solid date range on it, ma'am.

Q    Okay.  Did he tell you how much he paid?

A    Over time or for that initial sexual encounter, ma'am?

Q    Over time, he had more of a year of encounters.

A    Over time he indicated it was tens of thousands of dollars that he had paid to Mr. Herbert.

Q    For sexual favors?

A    For sexual favors and response to threats and harassment, yes, ma'am.

Q    And how much he pay for sexual favors?

A    I'm not able to allocate how much were specifically for the sexual favors and how much was a result of being extorted.

Q    When did this extortion or alleged extortion start?

A    Again, he wasn't able to put a solid date range on that as to when the threatening communications started, but it was sometime in 2022 I believe.  It was after Mr. Smolders had wanted to stop all contact with Mr. Herbert and had cut him off with money.

Q    And we don't have a date for that?

A    I don't have a date as to when he --

Q    Because the text messages that were submitted are from April this year.

A    Are you asking me?

Q    I'm -- yes, I'm not asking you, I'm telling you --

MS. ZACK:  I'm going to object, Your Honor.  I would ask for her to be specific about which text messages between what parties.  There's at least three phones, probably more involved in this.

THE COURT:  Okay.  Let's re-ask -- re-ask the question.

MS. OBANDO:  Thank you, Your Honor.

BY MS. OBANDO:

Q    Okay.  So was handed text messages between my client and somebody else, and I believe Vanessa Walther.  Do you have those?

A    I do not have them in front of me, ma'am.

MS. ZACK:  Yeah, you do.

THE WITNESS:  There we go.  Yes, I do now, ma'am.

BY MS. OBANDO:

Q    Okay, good.  Do you have the date for those text messages?

A    Which text message are you referring to, ma'am?

Q    The ones between Tyree and Ms. Walthers.

A    Let's see.  There are multiple text messages between Tyree and Ms. Walther, if you could show me directly which one?

Q    Just yesterday, the first page.

THE COURT:  Wait, wait, wait, hold on.  I can't

everyone overhear each other.  So ask a question, give time to give the answer, give time to ask another question. We're talking over each other.

MS. OBANDO:  Thank you.

THE COURT:  So, Ms. Obando, please ask the question again.

MS. OBANDO:  Yes.

BY MS. OBANDO:

Q    The text messages are dated yesterday and today.  Do you have that date?

A    Yes, ma'am.

Q    What is the date?

A    So he's talking about I signed the contract like you asked.  So this would have been after April 21st, and the text messages that Vanessa had provided me, she had received between April 22nd and April 29th.  But the actual text message itself that says today, it does not have a date, but it occurred after April 21st.

Q    Okay.  So the text messages you have are from April as well?

A    Yes, ma'am.

Q    Any evidence that the threats started before April?

A    That the threats started before April?

Q    Yes, sir.

A    Yes, ma'am.

Q    What's the evidence?

A    There's other text messages, and I have Mr. Herbert's admissions that he had made threats before this time.

Q    Where?

A    What was that, ma'am?

Q    Where are those admissions?

A    I had interviewed him after he was arrested, ma'am, and he admitted to sending a text message to Louis -- I'm sorry, Mr. Smolders, indicating that he was going to go to the police telling him that Mr. Smolders had raped him.

Q    Is that the text message in page number 3 of the complaint?

A    Yes, ma'am.

Q    And what is the date of that text message?

A    I do not have the date of that text message, and Mr. Herbert had a hard time telling me what date that that had occurred on as well, but it was --

Q    How did you get this text message?

A    I got that text message from Mr. Smolders' attorney, ma'am.

Q    Because it also says today?

A    Well, that's when the screenshot would have been taken, ma'am.  So the screenshot would have been taken on the date that Mr. Smolders had received the text message, and it can be provided at any time after that, it's still going to be

date marked today.

Q    Right.  But the -- so we don't have a date or we do not have a way to say this happened before April?

A    Well, I know it happened before April because Mr. Herbert told me it happened before April.  It happened --

Q    But that's all you know?

A    Correct.

Q    A man pay for sexual favors told you that he received this text message before?

A    And Mr. Herbert, the Defendant, yes, ma'am.

Q    Okay.  In the proffer it was stated that Mr. Smolder -- that's his name, right?

A    Mr. Smolders, yes, ma'am.

Q    Mr. Smolders lives in the countryside; is that right?

A    It's not in the -- no, it does not state in the complaint that he lives in the countryside.

Q    No, it was in the proffer that you just admitted to it.

A    Yes, ma'am.

Q    So he lives in the countryside?

A    You can consider where he lives as being in the country.  It's like a larger property that's -- it's in Houston, ma'am.  So it's not like out in -- outside of city limits in the country somewhere.

Q    This is Harris County?

A    Yes, ma'am, it's Harris County.

Q    And in it's in the city?

A    It's in the City of Houston, yes, ma'am.

Q    What do you mean by countryside?  And I'm really confused about this.

A    I'm not saying he lives out in the countryside.  His property is a larger gated property that's in the City of Houston.

Q    How would somebody have access to it?

A    To his property, ma'am?

Q    Yes.

A    You could hop the gate, or you could use a gate opener to enter the property.

Q    And did he tell you how Mr. Herbert -- let me rephrase that.

Did Mr. Smolders tell you how Mr. Herbert got into his property?

A    No, ma'am.

Q    He did not.  So by all means it could have been that Mr. Herbert had access to it?

A    I have text messages from Mr. Brooks --

Q    It's a yes or no question.  Sorry.

A    Sorry, what was that, ma'am?

Q    It's a yes or no question.

A    Okay.  Could you ask it again?  I'm sorry.

Q    Could it have been that Mr. Herbert had access to the property?

A    I do not believe so.

Q    Okay.  You don't believe so, but it could have been?

A    Yes.

Q    Because there's two ways to come in, right, that's what you said?

A    Yes, ma'am.

Q    Did you ever ask him if Mr. Herbert had keys to the property?

A    Did I ask Mr. Herbert if he had keys?

Q    No, did you ask -- I'm so sorry, Mr. Smolders if Mr. Herbert had keys to the property?

A    No, ma'am.

Q    You did not?

A    No, ma'am.

Q    So, he could have?

A    He could have keys to the property, yes, ma'am.

Q    Thank you.

     You also -- the Criminal Complaint, it states that you are an attorney?

A    Yes, ma'am.

Q    So you have some legal background, you know the law?

A    Yes.

Q    Right.  Are you aware of a crime of soliciting of

prostitution?

A    Somewhat, ma'am.

Q    However, Mr. Smolders is not being investigated for that crime?

A    Correct.

Q    Right.  Thank you.

Now, are you also familiar with statutory rape?

A    Yes, ma'am.

Q    Okay.  And do you know that there's no need to use force to commit a statutory rape?

A    Correct.

Q    However, Mr. Herbert was not a victim of statutory rape?

A    Are you asking me if he was a victim of statutory rape?

Q    Yes, I'm asking.

A    I do not know the age the consent in Texas, ma'am, but I believe it actually may be 17.

Q    Right.  So he's 17.

A    Okay.

Q    Was he a victim?

A    Mr. Herbert?

Q    Uh-huh.

A    Then, no.

Q    Yes.  And I'm going to go back.  Do you know how long this relationship -- yes, commercial relationship had been

ongoing?

MS. ZACK:  Objection, asked and answered, Your Honor.

THE COURT:  Sustained.  Next question.

MS. OBANDO:  Okay.

BY MS. OBANDO:

Q    So before you stated that this relationship had been ongoing since 2022?

A    Yes, ma'am.

Q    Okay.  Could it have been before July?

MS. ZACK:  Objection, asked and answered.

THE COURT:  We're asking the same question over and over.  That's sustained.  We've already plowed this terrain.

MS. OBANDO:  Thank you, Your Honor.

THE COURT:  I'm going to give you a great deal of leeway, but you've got to ask new questions.

MS. OBANDO:  Yes, Your Honor.

BY MS. OBANDO:

Q    As far as we know, how many times Mr. Herbert have shown up to Mr. Smolders' house?

A    About how many times?

Q    Yes.

A    I believe three to four times, was by Mr. Smolders' best estimate.

Q    Okay.  And you stated that Mr. Herbert also made a phone call to Mr. Smolders' wife; is that right?

A    That's correct.

Q    Yes.  Do you know how he had the phone number for his wife?

A    I do not, ma'am.

Q    Okay.  Do you have any knowledge about the wife knowing of the soliciting of prostitution?

        MS. ZACK:  Objection, relevance.

        THE COURT:  Overruled.

        THE WITNESS:  I believe she is aware of their sexual relationship.  I do not know if she knows that it began via Mr. Smolders finding Mr. Herbert on a website and hiring him.

BY MS. OBANDO:

Q    Okay.  Now, let's talk about the chickens in this case.

A    Yes, ma'am.

Q    Where do these -- how many chickens are we talking about?

A    I do not know how many chickens, ma'am.

Q    You don't know.  Do you know how are they kept?

A    Like in cages or just running around the property, ma'am?

Q    Okay.  Are they used for consumption?

A    I'm sorry, I was asking a question.  Is that what you

meant, like do I know if they're kept in cages or just loose around the property, is that what you're asking?

Q    Oh, yes, that's what I'm asking.

A    I do not know, ma'am.

Q    Okay.  Do you know what the use of them is?

A    In terms of like are they pets or?

Q    How Mr. Smolders use these chickens?

A    I do not know, ma'am.

Q    Do you know if they have any name?

A    I do not, ma'am.

Q    Okay.  Do you know if they can perform any tricks?

A    I do not.

Q    Have they been domesticated?

A    I don't know, ma'am.

Q    So we don't know if they're pets?

A    That's correct.

        THE COURT:  I got to ask.  I'm just curious, why does this matter?

        MS. OBANDO:  Well, Your Honor, it matters because 875 -- I'm sorry.  One of the charges in the accusation it's 2261(a)(2)(A) if I'm -- I'm sorry, it's 2261(a)(2).

    (Pause in the proceedings.)

        THE COURT:  Okay.  Okay.  Go ahead.

        MS. OBANDO:  And that's why I'm trying to come up with whether these chickens are pets or not.  The definition

of a pet is 2266(11).

THE COURT:  Well, let me just ask this, right.  So the statutory definition of pet means they're domesticated animals such as a dog, cat, bird, rodent, fish, turtle, or other animals that is kept for pleasure rather than commercial purposes.

Do you, Agent Gregory, have any idea whether the chickens were kept for pleasure rather than for commercial purposes?

THE WITNESS:  I have no knowledge that they're kept for commercial purposes.  I don't believe he's selling these chickens or using them in a commercial nature, Your Honor.

MS. OBANDO:  Which doesn't make them a pet either.

MS. ZACK:  Your Honor --

THE COURT:  Do you have any knowledge that they're kept -- hold on.  I'm going to ask the question.

Do you have any knowledge that they're being kept for -- so you don't have any knowledge they're being kept for commercial purposes; is that correct?

THE WITNESS:  That's correct, Your Honor.

THE COURT:  Do you have any knowledge they're being kept for pleasure purposes rather than for commercial purposes?

THE WITNESS:  That is my indication that they are

being kept for pleasure purposes.  Yes, Your Honor.

THE COURT:  Ms. Obando, I apologize.  Go ahead.

MS. OBANDO:  Thank you, Your Honor.

BY MS. OBANDO:

Q    How did you get that indication, sir?

A    Because of how sensitive he appeared when discussing his chickens and how upset he was by the threat that they would be killed.  It indicated to me that these chickens were sentimental to him in some sort of way, as one would feel about any other animal that subjectively someone would consider to be a pet.  That was the --

Q    But he never referred --

A    -- indication to me.

Q    -- them --

A    He did not refer to them as his pets.

Q    Or by name?

A    And he did not refer to them by names, ma'am.

Q    That's what you usually do with pets, right, you name them.

Now, I'm going to move from the chickens to the contract that my client was made to sign.

MS. ZACK:  Objection, Your Honor, as to characterization.  No one made her client do anything.

THE COURT:  I understand.  Rephrase the question.

MS. OBANDO:  Thank you.

BY MS. OBANDO:

Q    So the contract that my client allegedly signed.
Can you please tell me --

         MS. OBANDO:  Sorry, Your Honor.  I'm trying to
find my dates here.

BY MS. OBANDO:

Q    So on April 21 -- on April 20th you already had a
meeting -- had had a meeting with Mr. Smolders and was
informed of the situation that he was going through; is that
right?

A    Yes, ma'am.

Q    Okay.  Were you also informed on that day about the
personal agreement contract that his -- the people who were
allegedly threatening him were going to sign?

A    Ms. Walther indicated that they were trying to come to
some sort of agreement to arrange for the final payment to
make all this stop.  Yes, ma'am.

Q    Okay.  And I'm sorry I'm going to ask this.  I'm not
very familiar with procedures of the FBI.

         Is this common?  And by common, I mean the FBI is
informed that a crime is being committed, but yet a civil
solution is being sought and it keeps going.  Is that
common?

         MS. ZACK:  Objection, Your Honor.  That has no
relevance to probable cause or to detention.

THE COURT:  I'm going to overrule the objection.

THE WITNESS:  Would you mind asking it again, ma'am.  Is it?

BY MS. OBANDO:

Q    You were informed that a crime was allegedly happening, right?

A    Yes, ma'am.

Q    And you were also told that a civil solution was being sought; is that right?

A    I wouldn't necessarily consider this a civil solution, ma'am, but I --

Q    It's a contract that's being signed?

A    Yes, but not all contracts are enforceable and, you know, I wouldn't consider this a civil solution, ma'am.

Q    Okay.  But you were informed that a contract was being signed --

A    It was being --

Q    -- to stop?

A    Yes.  Yes, ma'am.

Q    Okay.  And you were present during the signing of the contract?

A    Yes, ma'am.  I was -- they did not know I was there but, yes, ma'am, I was there.

Q    Right.  And the people signing the contract were also not aware that the FBI had been told?

A    Correct.

Q    Right.  As far as you know, has the payment been made?

A    From this contract, ma'am?

Q    Yes, sir.

A    Payment has not been made, to my knowledge.

Q    Can you please tell me when was Mr. Herbert arrested?

A    I believe the date was April 28th, ma'am.  This would have been Friday.

Q    Where was he arrested?

A    At that same restaurant, Kojak's, located on 18th Street.  It's the same location they met to sign those agreements.

Q    And will you please tell me the circumstances of his arrest?

A    Sure.  So it was arranged that -- Ms. Walther arranged for a meeting for Mr. Herbert, Ms. Hall, and Mr. Brooks to come back to the restaurant for what they believed was payment under that contract that they had signed the previous week before.  And so when they arrived, we were waiting for them to arrive and then we executed the arrest, ma'am.

Q    Did Mr. Herbert resist arrest?

A    No, ma'am.

Q    He did not.

So is it fair to say that Ms. Walther was acting like

an agent for the FBI?

MS. ZACK:  Objection, calls for a legal conclusion.  Also, it assumes facts not in evidence that she was even there.

MS. OBANDO:  Your Honor, he just stated that she arranged the meeting.

MS. ZACK:  We can't hear you, Your Honor.

MS. OBANDO:  You're muted, Your Honor.

THE COURT:  Sorry.  Ask him first if she was there.

MS. OBANDO:  Yes, Your Honor.  He had stated before that she arranged the meeting.

THE COURT:  Okay.  Ask the question again.  You want to know --

MS. OBANDO:  Yes, Your Honor.

THE COURT:  -- ask the question.  I want to make sure I understand what the question is.

MS. OBANDO:  Yes.

BY MS. OBANDO:

Q    Is it fair to say that Ms. Walther was acting as an agent of the FBI?

MS. ZACK:  Objection, calls for a legal conclusion.

THE COURT:  I'm going to overrule the objection.

THE WITNESS:  I consider her to be a cooperating

witness, ma'am.  I just -- I'm not sure what you technically mean by agent.  But she was working with us at that time as a cooperating witness to arrange that meeting.

BY MS. OBANDO:

Q    Thank you.

Did you read this contract before it was signed?

A    Yes, ma'am, I've seen it.

Q    You were aware of the contents?

A    Yes, ma'am.

MS. OBANDO:  Okay.  I don't have more questions, Your Honor.

THE COURT:  Okay.  Ms. Zack, anything further from this witness?

MS. ZACK:  Yes, Your Honor.

REDIRECT EXAMINATION

BY MS. ZACK:

Q    Just so we're clear, he admitted to you to sending threatening texts prior to April of 2023; is that correct?

A    Yes, ma'am.

Q    Okay.  And as far as the keys, I know that defense counsel tried to suggest that somehow the car keys -- I'm sorry, the house keys or the gate key or all of that was given to him.  Is it also just as probable that he stole them while at the house?

A    Yes, ma'am.

Q    Okay.  And you also indicated that he didn't resist arrest.  But just for clarification, Ms. Walther was not present when the arrest was effectuated; is that correct?

A    That's correct.

Q    She set up that meeting, but she was not physically at that location when he showed up to collect his money?

A    That's correct.

Q    Okay.  And the -- other than -- it appears there are -- he has car keys, some type of gate or garage key, and his co-Defendant is in possession of these people's credits cards; is that correct?

A    Yes, ma'am.

Q    And to the best of your knowledge, none of those -- it was not indicated to you, by Mr. Smolders, that he gave any of those things to the Defendant or his co-Defendants?

A    That's correct.

     (Pause in the proceedings.)

          MS. ZACK:  Your Honor, I have no further questions.

          THE COURT:  Okay.  Agent Gregory, thank you very much.  You may step down from the proverbial witness stand.

     (Witness excused, 10:48 a.m.)

          THE COURT:  And, Ms. Zack, anything further from the Government?

          MS. ZACK:  As far as evidence for PC or detention,

no.  I have argument.

THE COURT:  We'll do argument in a moment.

MS. ZACK:  Okay.

THE COURT:  Ms. Obando, any proffer, any evidence, any witnesses that the defense would like to present?

MS. OBANDO:  Yes, Your Honor, I do have a proffer. In the courtroom is present Ms. Essence Herbert.  She is Mr. Hebert's mother and she is willing to serve as a third-party custodian.  I understand that one of the concerns of the Government, or that were presented here, is that he lives five minutes away from the property of Mr. Smolders.

His mother doesn't live close to him and she is a student, a nursing student as the pretrial report services had stated, and she has indicated that she would be willing to serve as a third-party custodian for her son.

THE COURT:  And that's -- Ms. Smith is the grandmother and Ms. Hebert is the mother; is that correct?

MS. OBANDO:  Yes, Your Honor.

THE COURT:  Now, in the pretrial report it says Ms. Hebert could not serve as the third-party custodian if I was willing to go that route because she had a conviction for misdemeanor theft to which she was sentenced to 10 days confinement.

Did I misread that or am I missing something?

MS. OBANDO:  It does say that she has a

conviction, Your Honor.  They indicated that they're not suitable to ask as a co-surety, which I'm not very clear as to why.  She's completed her sentence and she has nothing else pending with the criminal system.

THE COURT:  Okay.  Anything further, Ms. Obando?

MS. OBANDO:  No, Your Honor, not with regard to that.

THE COURT:  Okay.  Terrific.  Thank you very much.

Ms. Zack, argument?

MS. ZACK:  Well, Your Honor, if you're consider this woman as a potential custodian or co-surety, I think I have an opportunity to cross-examine her about her history with this individual.  I mean, he's been a thief since he's 14 years old.  He's got numerous convictions and we're --

MS. OBANDO:  Objection, Your Honor.

MS. ZACK:  -- going to let him go to the mother. I mean --

THE COURT:  Hold on.  Hold on.  Hold on.  Let's have argument now.  I'm not letting you call the mother as a witness.

MS. ZACK:  Your Honor, the --

THE COURT:  You rested your case.  Make argument.

MS. ZACK:  The United States, Your Honor, believes based on the facts in the Criminal Complaint and the facts presented during the hearing that we have certainly met the

burden as to probable cause.  Moving --

THE COURT:  Let me stop you there.  Let me stop you there, Ms. Zack, and I apologize.

Ms. Obando, let's talk about probable cause up front.  Is there an argument against at least probable cause being shown here?

MS. OBANDO:  Yes, Your Honor, there is.

THE COURT:  Okay.  Tell me why.

MS. OBANDO:  Okay.  Well, Your Honor, my understanding of probable cause is to ensure that there are substantial grounds upon which a prosecution may be based.  While there might be minimal amount of testimony on each element of the offense, I believe that elements of defense at least have to be proven or shown here.

My client has been charged with two separate, but similar I guess, violations and I can address them individually.  875(b) talks about intending to extort from any person in this case by transmitting communications containing threats to injure the property or reputation of the addressee or accusing them of a crime, and I'm paraphrasing.

I don't see how the Government is meeting that.  I do see in the Criminal Complaint that -- page number 3, that my client is asking Mr. Smolder to call him and telling him that he's going to the police.  As you heard today,

unfortunately here, he is not the victim of a crime. He is the minor of 17 years old who had started engaging in sexual activities with a man of 82 years old, an 82-year-old man. He's not protected by the law anymore.

THE COURT: Let me make sure I understand this. So your position is that your client was a minor at the time, so your client can make whatever allegations he wanted or whatever threats he wanted at this 82-year-old man, and it's totally legal and proper simply because he was --

MS. OBANDO: No, Your Honor. What I'm saying --

THE COURT: Because I'm not sure I understand the argument.

MS. OBANDO: I understand. What I'm saying is, my client is not the victim of a crime. He was 17 when he started engaging in sexual activities with this 82-year-old man.

THE COURT: Okay. Let me have Ms. Zack address that real quick.

MS. ZACK: I'm not sure what I'm addressing, Your Honor. I don't know what I'm addressing. The Defendant threatened to go to the police claiming that, "I'm going to tell the police you had sex with me for money, or that you raped me." So he's claiming he was raped and now he's extorting the Defendant -- the victim, Mr. Smolders, who is not charged with any crime. I don't understand why they're

suggesting that if Smolders maybe engaged in some illegal activity, let's say he did, that doesn't vitiate the Defendant's criminality.  He's using that to extort Mr. Smolders.

THE COURT:  Okay.

MS. ZACK:  There's no exception in the statute that says if the victim committed a crime that the Defendant can't be held liable for extorting him.  That's ridiculous. It doesn't say that.

THE COURT:  Right, Ms. Obando?  If I just assume for the sake of argument here today that the 82-year-old man committed a crime, it in fact says it doesn't mean that your client could have violated --

MS. OBANDO:  Yes, Your Honor, and it's not my allegation.  Because this man I would say --

THE COURT:  Then you've lost me.  I've got to be honest.  I don't -- let's start over because I don't understand the argument.

MS. OBANDO:  Yes, Your Honor. Okay.  Let me try and make it clear.  We are getting of course a one-sided view of a conversation.

THE COURT:  This is a probable cause hearing.  The Government has an obligation to show if there's probable cause.  I'm not -- okay, it's one-sided.

MS. OBANDO:  We are getting a partial view of a

conversation between two consenting people who had sex.

MS. ZACK:  And an admission by the Defendant that he was extorting him.

MS. OBANDO:  Are you going to let me talk?

THE COURT:  Go ahead, Ms. Obando.

MS. OBANDO:  Thank you, Your Honor.

Now, my client cannot go to the police with this. My client cannot go to the police and say that he's a 17-year-old guy and was raped.

THE COURT:  I'm not sure I understand why not, but okay.  Let me not interrupt.  My fault.  I apologize.  Let me not interrupt you.  Let me make you -- I'm going to let you free reign to make whatever argument you would like on probable cause.

MS. OBANDO:  Thank you, Your Honor.  I appreciate that.

As for the stalking statute, I will go back to the argument of the chickens and how these chickens are not pets.  And I can have a cricket in my backyard that I enjoy watching and listening to it every night, doesn't make it my pet.  I can very well fry it at night.

Same thing goes to these chickens.  I may have chickens in my back yard that I can use for consumption. Maybe I'm not selling them, maybe I'm not producing them at a large scale, but I can very well eat them without any

problem, Your Honor, which we were not presented with any information as to why these chickens should be considered pets, and why my client should be here sitting today over these chickens.

THE COURT: Okay. Anything further, Ms. Obando?

MS. OBANDO: No, Your Honor.

MS. ZACK: Can I please respond?

THE COURT: I find that the Government has -- no.

MS. ZACK: Okay.

THE COURT: I find that the Government has met its burden to show by probable cause that the Defendant has committed the acts to which he has been charged in the complaint.

So that disposes of the probable cause hearing.

Let's talk about detention now, Ms. Zack. Your basis for detention?

MS. ZACK: Your Honor, I believe the Defendant is a danger. These individuals -- Mr. Smolders and his wife are afraid of him. They have found him on their property when they have arrived home, uninvited. They have come to learn that he's been on their property when they weren't there by their own -- by his own admission when he called the wife's phone. He and his co-Defendants are in possession of their property, that being credit cards, car keys, and/or a garage door opener/gate opening device.

He has threatened the -- to kill the chickens on the property.  Whether they are pets or not, that is -- that caused serious distress to the victim and his wife.  He has destroyed -- Mr. Herbert has destroyed other property there around the pool.  It is very clear that he has easy access.

He is also, Your Honor, a, for lack of a better term, a career criminal.  Your Honor looked at the Pretrial Services report.  Since age 14 he has been stealing things, credit cards, cars.  He's been burglarizing people's cars.  He is currently -- has two pending cases, one from April of 2022, one from July of 2022, pending in Harris County when he was an adult under Texas law, that being 17, and while those were pending, he goes on and engages in this scheme to extort and stalk an 82-year-old individual.  Obviously, he is in much better physical shape than this individual and the fact that he has been to their property is incredibly intimidating.

It's very clear, Your Honor, that he has no structure in his life.  He has no job.  He has no way to earn a living other than prostituting himself, which he put himself out there on the Internet to sell his body.  But clearly, he doesn't have any assets.  He has nothing to tie him to the community, other than his mother and grandmother, but the mother is not an appropriate surety, co-surety custodian.  I mean, where were the mother and the

grandmother when he was running around Montgomery County committing all of these different thefts, getting arrested by the Conroe Independent School District police, the Katy Police Department, the Harris County Sheriff's Office, the Houston Police Department?

He is a one-man crime wave, and I don't believe that he will listen to his mother.  I don't believe that he will listen to his grandmother.  I don't believe that someone who was already out on bond who then engages in a long-term scheme to defraud these people and to terrorize them, can be controlled by an ankle monitor, and neither does Pretrial Services in that they have also recommended that he be detained.

I do not believe, Your Honor -- up until the time that he was arrested, he was still talking about wanting to communicate with the Defendant and get his money.  I mean, he believes he is entitled to money and he's obviously going to stop at nothing to get it.

So I feel, Your Honor, that these individuals are in danger.  They are elderly.  They need to be protected, and keeping him in custody until the resolution of this matter is the safest and least restrictive means that is going to protect, not only the victims in this case, but society as a whole.

THE COURT:  Make sure I understand, Ms. Zack.

Obviously, you focused on the danger to the community.  Are you also seeking detention as risk of flight or not?

MS. ZACK:  I do believe he's a risk of flight because now he is facing federal prison time.  He obviously has been involved in the criminal justice system.  He has no reason to show up.  But under the subsection of 3142, I believe that the better argument, Your Honor, is that he is a serious risk of obstructing, threatening, injuring, or intimidating a prospective witness or a juror.

I mean, he has already demonstrated all of those things.  He called up the victim's wife and was cursing at her and demanding things from her, and has shown up uninvited to their property.  I mean, this is incredibly intimidating to two individuals in their 80s.  And the fact that he then got two other individuals involved, because he was the original contact with Mr. Smolders.  I mean, this is -- you know, he is the reason that we are here.  I mean, he's the original reason.

And I don't believe, Your Honor, that him being out is going to protect them from further intimidation, threats, and the like.  I mean, it's not like they can just up and move.  He knows exactly where they live.  He's been on the property, unauthorized, on numerous occasions.  An ankle monitor is stopping him from doing that.  And he's -- I mean, he's been ignoring the law since he's 14 years old.

Why is he going to abide by it now?  I mean, the greatest indication of future behavior is past behavior, and his past behavior is a disaster.

THE COURT:  Okay.  Let me ask you a question. Just help me out.  Maybe I'm missing something, right.  On 4141(F) it talks about the situation, (1), is upon motion of the attorney for Government and it lists a certain number of crimes.

MS. ZACK:  Right.

THE COURT:  And then on (2) a motion to the attorney for the Government or a judicial officer's own motion in a case that involves either serious risk that the person will flee, which you're not going under.

MS. ZACK:  Right.

THE COURT:  The second one is a serious risk that such person will obstruct or attempt to obstruct justice or threaten, injure, or intimidate or attempt to intimidate, threaten, injure, or intimidate a prospective witness or juror.

MS. ZACK:  Right.

THE COURT:  Once that is shown, then the question becomes under (E) above, right, whether or not there's any condition or combination of conditions that will reasonably assure the appearance of a person as required and/or the safety of the community and the person, correct?

MS. ZACK:  Correct.  And it further states that, further down, where it talks about the factors that the Court has to consider in subsection (g) and obviously all of those factors go to whether the person is a danger to the community or reasonably assure their appearance, yes.

THE COURT:  Right.  And I understand your argument on the danger to the community.  I guess on the risk of flight your argument is, yes, this Defendant is a risk of flight because he's facing federal prison time?

MS. ZACK:  And because he has no reason to answer to these charges.  He has no assets.  He has no job.  He has nothing.  I mean, why is he going to show up?

THE COURT:  Okay.  Understood.

MS. ZACK:  I'm much more concerned, Your Honor, with him harming and continuing to threaten and intimidate these individuals, the victim and his wife, than I am with his appearance.

THE COURT:  Understood.  I just want to make sure I understand exactly the grounds that are being based.

Okay.  Ms. Obando?

MS. OBANDO:  Thank you, Your Honor.

THE COURT:  By the way, don't spend any time on risk of flight, because I don't think there's risk of flight.  This person has lived in Houston forever.  Yes, he's facing federal prison time.  Yes, he has no job.  Yes,

he has no assets.  My view is, if that was the test to hold someone in custody, we'd be overflowing, we'd be detaining everyone who's being charged with a crime.  That ain't the law, that ain't going to be -- that is not my policy and procedure.

So I do not think the Government has met its burden on the risk of flight.  I think the question here is, is the Defendant a danger to the community?

MS. OBANDO:  Thank you, Your Honor.  I appreciate that.  My argument was going to be he's also poor.  So we're not putting people in prison because they're poor.

THE COURT:  I totally agree with that 100 percent, but I don't think that's the issue.  The question is, hey, given the allegations that are made, like given that he was on the property, that both when the persons was there, when he wasn't there, that he was involved in, at least the evidence so far, are an extortion, stalking on an 82-year-old man, where he threatened to kill animals on the property, is that a real danger, threat of danger, and is that something -- is there any conditions that I could impose to alleviate that threat?

MS. OBANDO:  Yes, Your Honor.

THE COURT:  That's how I sort of view it in a vacuum.

MS. OBANDO:  And I think it's a very fine line in

between talking about the danger he may represent to the community and the conduct that was alleged today, or it's been alleged by the Government that my client has stalked.

But the question comes to whether there are conditions that can be imposed to ensure that he's not a danger to the community, that he doesn't represent an obstruction of justice.

And, yes, there are conditions. We submitted them in the motion that we filed yesterday. His mother is willing to serve as a third-party custodian. He is willing to have a GPS monitor that will ensure that he's not around the house or the property of Mr. Smolders. He will not have any contact with the victim, as any other requirement by release conditions. When release conditions are imposed, that's one of the requirements usually, you do not have any contact with the victims or the co-Defendants. My client is not planning to contact this man anymore.

One of the requests that we had filed in the motion or we have presented in the motion is that he be allowed to continue his GED education or complete his GED education and/or to obtain any type of vocational training that would ensure that past this point my client is prepared to face his life.

He is 18, Your Honor. The Government has presented a horrible picture of my client, but they're

forgetting that he's 18.  And one of the concerns in this case is, at least for me, and it seems to be not my job usually to stand next to a potential victim of a case.

He's been living on his own for some time now, and prostitution, it's a very serious ill in our society that can border sometimes with being trafficked.  I believe that forcing my client to live with his mother will ensure some sort of protection for him as well.  Allowing him to continue or obtain vocational training would ensure that he's not victimized ever again for prostitution.

As to all the conditions, restricting communications, as I mentioned before, ensuring that he wears an ankle monitor, would allow for him to be released and not facing certain dangerous conditions in prison that he might be facing there.

In addition to it, Your Honor, my client is transitioning to a woman and he needs the treatment that he's receiving.

And for these reasons we would request the Court to allow him to be released into enforced conditions, that there are conditions that can be imposed that would ensure that he doesn't obstruct justice, that would ensure that he's not a flight risk, and that would ensure that his safety and his well-being.

Thank you, Your Honor.

THE COURT:  Okay.  Thank you very much.

Ms. Zack, let me ask you a question.  What about the point about, hey, there's conditions that I could impose.  Like, why couldn't I put an ankle monitor and say you can't go within five miles say of LS's -- LS location?

MS. ZACK:  Because there's no indication, Your Honor, that he's going to abide by that.  He has been committing crimes and disregarding the laws of the State of Texas since he's 14 years old.  No offense, Your Honor, why is he going to listen to you?  He was already out on two separate bonds while this scheme was going on.  What is an ankle monitor going to do to prevent him from picking up the phone and calling these people and threatening them and doing any of that?  There is nothing you can do to prevent that other than put him in custody.  He can go there.  He can do whatever he wants.  He can cut the ankle monitor off.  But how are we keeping him from communicating with these individuals.

MS. OBANDA:  Your Honor?

THE COURT:  Let me ask this:  I want to make sure I'm clear.  Was he on bond when this -- I'm looking at the pretrial report right here.  Was he on bond for other cases -- did he violate his previous bond conditions?  I can't tell that.

MS. ZACK:  I would assume that even if he's on a

personal recognizance bond, part of that is you cannot commit any other crimes while out.  He was out.  So he had to have been on some sort of bond.  He has two pending charges with matters set for May 13th and May 31st respectively.  So he's on some type of release.  And part of that is you are told you cannot commit any other crimes.

I mean, and these are not minor crimes.  I mean, he stole a vehicle and he stole property worth somewhere between 100 and $750, and somehow the burglary of motor vehicle is enhanced.  I don't know what that means.  But either way, this is not someone that takes direction, Your Honor.

MS. OBANDA:  Your Honor, if I may address that?

THE COURT:  Okay.  Go ahead, Ms. Obando.

MS. OBANDA:  To begin with, any criminal record that my client may have as a minor should not be taken into consideration, and I believe that --

THE COURT:  Why not?

MS. OBANDO:  Because he was a minor, Your Honor.

THE COURT:  Why?

MS. OBANDO:  He was a minor.

THE COURT:  Is there any law that says I don't look at any of that?

MS. ZACK:  No.

MS. OBANDO:  Yes.  And I don't have --

THE COURT:  But if there is, I just want to know because I didn't realize.  I didn't realize that I just ignore anything that happened before he turned 18 in considering whether or not he's a danger to the community.

MS. OBANDO:  I think 17, Your Honor, but -- I believe so.  Let me -- I can give you the cite in a moment.

My second point to that will be, there's two pending charges, yes, from 2022.  Those two pending charges are that, pending.  That doesn't mean that he actually committed that crime.  Same as the charge that we have pending here.  Yes, Your Honor, found probable cause, but that doesn't mean that my client committed that crime.  That doesn't deprive him from the presumption of innocence.

And now to the Government's argument that nothing will stop him from communicating.  For that sake then, why are we, and I hate to do this, but why are we agreeing to a bond for a co-conspirator when the co-conspirator also had contact with the guy and has the same charges pending.

THE COURT:  Okay.  Let me just go back here.  I'm going to take a look at one thing.  Let me go off the Record for one second.

(Recess taken from 11:18 a.m. to 11:22 a.m.)

AFTER RECESS

THE COURT:  Obviously we're here today on the Government's request that the Defendant be detained, and I

appreciate all the time and effort counsel put into this.  I know we went on -- we went a long time.

Obviously, and I just say this for the Record, I know the lawyers are well aware of this, but a couple of initial sort of thoughts or principles.  Obviously, the Defendant is innocent until proven guilty, nothing that goes on here at today's proceeding is intended in any way, shape, or form to impact that presumption of innocence.

The sole question on the detention issue that I have to decide here today is whether or not -- well, we'll walk through the details.  But under the Bail Reform Act detention is the exception rather than the rule, and I can only hold a Defendant pending trial if the Government can show that the Defendant is a risk of flight or danger to the community and there are no conditions or combination of conditions that I could impose to alleviate that threat.

This is not a presumption case, so we look at the risk of flight and danger to the community arguments.  As I mentioned -- well, as we know the risk of flight issue, the Government has to show by a preponderance of evidence that no conditions or combination of conditions would assure the Defendant's presence.

I don't think the Government has met that burden, simply because this person lived in Texas their whole life, a U.S. citizen.  I don't even know where else he would go.

Yes, he's facing serious federal prison time.  Yes, he has no job, no assets, but we don't just hold people in custody because they're poor and they face charges from the Government.

The real question here is, this case turns on whether the Defendant is a danger to the community and that test as we all know is the Government has a higher burden, which is to show by clear and convincing evidence that no conditions or combination of conditions will reasonably assure the safety of the community.

Let me say, on this case the reason it took me time, I had to collect my thoughts for a minute, I think this is a close call.  Obviously, they're extremely serious charges to which have been brought, the extortion and stalking of an 82-year-old man and, you know, given the past criminal history.  I -- no doubt about it, I have a serious concern whether or not Defendant is a danger to the community.

At the end of the day, though, the question is are there any conditions that I could impose to alleviate that threat?  And the Government has to show by clear and convincing evidence that there are no conditions or combination of conditions that will ensure the safety of the community.

Now, I do not think the Government has met its

burden, because I think I can craft conditions that will assure the safety of the community, and they're going to be damn onerous, no question about that, but I think that they are appropriate in this particular case.

Let me ask a question before I go further, because I want to make sure I'm clear. LS -- what location was within a short distance of LS? Was that one, the grandmother or the mother?

MS. OBANDA: The apartment where Mr. Herbert lives, was living before this.

THE COURT: Okay. Where he is currently living?

MS. OBANDA: Well, he was evicted already. So he doesn't have --

THE COURT: Where's the mother -- what's the mother's address?

MS. OBANDA: She lives in Willis, Texas, Your Honor.

THE COURT: I'm sorry?

MS. OBANDA: She lives in Willis, Texas.

MS. ZACK: Willis.

MS. OBANDA: Thank you.

THE COURT: What county is Willis in?

MS. OBANDA: That's Montgomery County.

THE COURT: What's the address for the mother?

MS. OBANDA: Yes. 13069 Oak Manor Court.

THE COURT:  Zip code?

MS. OBANDA:  I'm sorry?

THE COURT:  Do we know a zip code?

MS. OBANDA:  77318.

THE COURT:  Okay.  Here's what I'm going to do.  As I said, I think there's some conditions I can impose, but they're going to be very onerous, and I want to make sure, Mr. Herbert, you understand that you're going to need to abide by these conditions to the T.  If you step out of line one iota, you violate one of these conditions, I am confident we'll be back in here and Ms. Zack will request you be detained, and I'm giving you one chance.  If you violate this in any way, shape, or form, you understand the consequences that you will be detained pending the trial of this case.

Do you understand that, sir?

DEFENDANT HERBERT:  Yes, sir.

THE COURT:  Okay.  Here's the conditions:  First, you must not violate any federal, state, or local law while on release.  You cannot intimidate any witness or juror or officer of the court, can't obstruct any criminal investigation.  You have to appear in court as required, surrender to serve any sentence that is imposed.  I'm going to have a $50,000 bond, which means that -- unsecured -- in the event you violate any of these conditions, you could be

responsible for paying up to $50,000.

You're going to be required to report to Pretrial Services. You're going to be required to maintain or actively seek full-time verifiable employment. You are to surrender if you have a passport to Pretrial Services. You're to obtain no further passport. Your travel is going to be restricted to Montgomery County and the bordering counties, just counties that touch Montgomery County.

You're to avoid all contact directly or indirectly with any person who is or may become a victim or potential witness in the investigation or prosecution, that includes any co-Defendants, that includes LS, that includes LS's wife, and any member of LS's family.

You're refrained from possessing a firearm, destructive, other dangerous weapons, no use of alcohol at all. No possession of a narcotic drug or other controlled substance unless prescribed by a doctor, no CBD use. You're required to submit to testing by Pretrial Services to determine whether you're using a prohibited substance.

You're going to be subject to an ankle monitor, active GPS, and you're going to be on home detention, which means you're restricted to the residence of your mother at 13069 Oak Manor, Willis, Texas, 77318, at all times except for employment, education, religious, medical, or court appearances or court obligations.

Okay.  That means, no, I want to go out to dinner, no, I want to go out to hang out with friends.  You got to stay at that address but for, you know, work, religious, medical issues.

In addition, I don't care whether it's for your work or what condition, you are not to get within five miles of LS's residence.  Okay?  And that burden is on you, sir.  You can look at a map.  If there is one inch within a five miles radius of you coming to LS's house, you are in violation of the condition of release.

Do you understand that, sir?

DEFENDANT HERBERT:  Yes, sir.

THE COURT:  Okay.  In addition, if you have any contact with law enforcement, even if you get pulled over at work, you know, speeding or alleged violation, you need to report that to Pretrial Services.  Don't let pretrial -- don't let the officers inform Pretrial Services, you be the first one to do so.

Okay.  Let me ask first, do you understand those conditions as I've explained them?

DEFENDANT HERBERT:  Yes, sir.

MS. ZACK:  Your Honor?

THE COURT:  Hold on, Ms. Zack, one minute.

Any questions for me on those conditions?

DEFENDANT HERBERT:  No, sir.

THE COURT:  Okay.  Now I want to hear from Ms. Zack and pretrial, are there any -- and Ms. Obando --

DEFENDANT HERBERT:  Can I ask --

THE COURT:  -- are there any conditions --

DEFENDANT HERBERT:  Can I ask a question?

THE COURT:  I'm sorry?  Yes, sir.

DEFENDANT HERBERT:  What if LS contacts me or calls me or tries to, you know, something like that?

THE COURT:  Hang up the phone, no contact at all.  Don't say a word.

DEFENDANT HERBERT:  Yes, sir.

THE COURT:  I want to see, is there anything from Pretrial, Ms. Zack, anything else you think I should add?

MS. ZACK:  Yes, yes.  I want it to be very clear he cannot live in a home with weapons.  You said he couldn't possess a weapon.

THE COURT:  Absolutely.  Absolutely.  And actually I'm glad you mentioned that.  I think there was a mention --

MS. ZACK:  Yes.

THE COURT:  -- in the pretrial report that there were some weapons at the property.  Those need to be taken -- I guess have to go to pretrial on how we do that.  But any weapons need to be taken out of the home where the mother is.

MS. ZACK:  And, Your Honor, I also want it to be

clear that he should not be contacting Ms. Walther, Mr. Brooks, or Ms. Hall. Ms. Walther is a witness in this case. Mr. Brooks is a co-Defendant, and Ms. Hall is a co-Defendant, and he may not know what those --

THE COURT: Fair enough. Let me clear to the Defendant. No contact with any -- no contact. Okay, that's in person or on the phone with any of the co-Defendants, and that includes Ms. Hall -- I'm going to write this down, too. Ms. Hall and Mr. Brooks. Did I get that name right?

MS. ZACK: Yes, Your Honor. Anyone on behalf of Mr. Brooks, because we know that he is using other people to try to contact parties in this case. He doesn't -- I'm not sure he understands what third-party contact means. He needs to know that counts, too.

THE COURT: Fair enough. Let me say this to be clear. You are to have no contact in person or phone with Ms. Hall or Mr. Brooks or Ms. Walters is the name, right?

MS. ZACK: Walther.

THE COURT: How do you spell it?

MS. ZACK: W-A-L-T-H-E-R.

THE COURT: Okay. So, sir, you are to have no contact with Ms. Walther, Mr. Brooks, or Ms. Hall, and in addition not only do I mean you can't talk to them, you can't see them, but you're to have no communication directly or indirectly. And what I mean by that is, you're not to

pass messages on to them through someone else.  They're not to pass messages on to someone else.  If that happens, if they try to give you a message or someone tells you they're reporting something, you know, something they want to tell them, you notify Pretrial Services immediately, okay?  And we better not find out that you're trying to go through some other person and pass messages onto Ms. Hall or Mr. Brooks.

Do you understand that, sir?

DEFENDANT HERBERT:  Yes, sir.

THE COURT:  Okay.  Ms. Zack, anything additional that you think I should add?

MS. ZACK:  I mean, I don't think that this is going to stop him, but I can't think of anything additional you can do.  I think we're just going to have to wait it out until he messes up.

THE COURT:  Okay.  Pretrial, anything else that I'm missing or should add?

MS. BARRIENTOS:  Good morning, Your Honor, Karen Barrientos with Pretrial Services.

I just did have a few suggestions if you wanted to consider, which was the firearms just to be removed, which we already cleared that up.  And also if you wanted to include the condition to comply with court obligations in Harris County, and also if you wanted to specifically add a condition for must reside with mom at such and such address

or if you were going to be considering her as the third-party custodian.

THE COURT:  I'm not going to appoint her as the third-party custodian because of her past criminal history, but I am going -- a special condition, I'm going to require that he comply with court obligations in Harris County, meaning if you violate any conditions of any release in Harris County, you're in violation here.

In addition, you are to reside with your mom at 13069 Oak Manor, Willis, Texas, 77318, and not to go within five miles of LS or LS's residence, and -- you understand where that is, right, sir?

DEFENDANT HERBERT:  Yes, sir.

THE COURT:  In addition, I want all weapons -- how do we make sure, Pretrial, that all weapons are removed from that house?

MS. BARRIENTOS:  We typically require for an affidavit to be submitted just saying the weapons have been removed.  It can be notarized as well.

THE COURT:  Okay.  I'm going to put a condition that -- and I guess I defer to you all, it's above my pay grade on how to make it work, but I want all weapons removed from the house to Pretrial's satisfaction before release.

MS. BARRIENTOS:  And also, Your Honor, would you be considering for him to incur the cost for the location

monitoring?

THE COURT:  Yes, to the extent the Defendant can pay, he's responsible for all that.

MS. BARRIENTOS:  Thank you.

THE COURT:  Make sure I got everything.  Okay, those are all the conditions.  Any last questions for me, sir?

MS. OBANDA:  No, Your Honor.

THE COURT:  Okay.  Listen, I'm going to say it again.  Follow these conditions to a T.  Your lawyer doesn't want to see you again on violating conditions.  I don't want to see you.  Ms. Zack doesn't want to see you.  And do you understand fully and clearly that if you violate any of these conditions, no matter how small, I've only said it 10 times, you're going to be in custody pending trial, no ifs, ands or buts.  You're getting a chance now.  You screw this up, then you understand the consequences, sir, correct?

DEFENDANT HERBERT:  Yes, sir.

THE COURT:  Okay.  If you do have any questions, talk to your lawyer, talk to Pretrial Services.  As I tell every criminal Defendant, don't ask for forgiveness later on.  If there's any question about whether you think you're doing something might be in violation of what I just went over, and your lawyer will be able to give you a copy of these, you ask beforehand.

I will fill this out, sign it, give it to Mr. Castro, and he'll submit it.  Is there anything else we need to address here today on behalf of the Government?

MS. ZACK:  Not as to this Defendant, Your Honor.

THE COURT:  Okay.  And, Ms. Obando on behalf of your client?

MS. OBANDA:  No, Your Honor.  Thank you so much.

THE COURT:  Okay.  Thank you all very much. You're excused.

(Proceedings adjourned at 11:40 a.m.)

*  *  *  *  *

*I certify that the foregoing is a correct transcript to the best of my ability due to the condition of the electronic sound recording of the ZOOM/video/telephonic proceedings in the above-entitled matter.*

*/S/ MARY D. HENRY*

*CERTIFIED BY THE AMERICAN ASSOCIATION OF*

*ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

*JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

*JTT TRANSCRIPT #67469*

*DATE FILED:  AUGUST 10, 2023*